# EDWARD ROSENQUIST v. ALFRED V. BAKER AND ANOTHER.[1]

November 26, 1948.

No. 34,749.

---

[1]Reported in 35 N. W. (2d) 346.

*Theodore F. Neils,* for appellants.
*Harry E. Burns,* for respondent.

FRANK T. GALLAGHER, JUSTICE.

Appeal from an order of the district court denying defendants' motion for judgment notwithstanding the verdict or for a new trial.

At the outset of their brief, defendants take the position on appeal that no cause of action was proved in the court below, and they are content to have the case tested on the sole testimony of plaintiff and his witnesses.

Defendants, hereinafter referred to as Mr. and Mrs. Baker, operated a restaurant known as the Northland Cafe in St. Cloud, Minnesota. The owner of the building in which the restaurant was located was one Frank Graham, but defendants' rights in the premises until July 1, 1947, were under a sublease from Robert C. Coborn, who in turn was lessee of the owner. Plaintiff, a resident of Chicago, who was vacationing in Minnesota in 1947, heard that the restaurant business operated by defendants was for sale. He first talked about it with Mrs. Baker in the latter part of June or the first week in July 1947. Plaintiff testified that Mrs. Baker said the business would be for sale, but that "the lease would be up the first of July [1947] and they would have to get a new lease before they could sell the business." Shortly after this conversation, plaintiff also had a talk with Mr. Baker about the deal and made him a proposition of $2,500, plus inventory, for the business. At that time, Mr. Baker took plaintiff's name and address and told him that if he could get another lease he would let plaintiff know.

A daughter of Frank Graham, owner of the real estate, testified on behalf of plaintiff that on August 7, 1947, she was present at a meeting in her home with Mr. and Mrs. Baker and her father, at which time the Bakers asked for a renewal of the lease or a new lease, but that they were informed by Graham that he did not care to give a lease because he intended to use the property himself in

the spring. She said that her father finally consented to give the Bakers a lease on the building until July 1, 1948. In any event, a lease of the premises, dated June 23, 1947, for a term of one year from July 1, 1947, was executed by Graham and his wife, as lessors, to Mr. Baker, lessee, on August 8, 1947.

Plaintiff testified that about the middle or latter part of August 1947 Mr. Baker, in accordance with previous plans, informed a sister-in-law of plaintiff residing in the vicinity of St. Cloud that he had obtained a new lease from the owner. She telephoned this information to plaintiff in Chicago. Plaintiff further testified that upon receiving this word he telephoned Mr. Baker from Chicago.

Defendants direct our attention to what they consider a variation in plaintiff's testimony on the first and second days of the trial with reference to this telephone conversation. On the first day, plaintiff testified that Mr. Baker had told him that the lease he secured from the owner "was only for one year but it runs on from year to year because the owner was a civil service employee in Washington and had four years more to go on that before he would be retired." Plaintiff said that he believed what Mr. Baker had told him and relied on it. When further asked what he did in reliance on these statements, he said that he had his father-in-law go over and give Mr. Baker a $200 down payment on the business, that he quit his job in Chicago, where he had worked for 14 years, and that he and his family moved in with his father-in-law at St. Cloud. On the second day of the trial, when asked to repeat what Mr. Baker had told him over the telephone, plaintiff said:

"Just as I told you now, he had a lease for a year and I would have no trouble in getting the lease renewed from year to year because the people lived in Washington and he was a civil service employee and he had four years to go before he would be retired."

While there is a discrepancy in the testimony, it is evident that the jury believed that plaintiff was given to understand that the lease was renewable.

Sometime after this telephone conversation and toward the latter part of August 1947, after plaintiff reached St. Cloud, he went to see

the Bakers. He said that they went through the inventory and went to see Mr. Baker's lawyer. On August 26, 1947, defendants and plaintiff visited a bank in East St. Cloud, where some of the papers involving the sale were prepared by a bank employe, who acted as a witness and also as a notary. Plaintiff said that Mr. Baker explained the conditions of the deal to the bank employe in connection with the preparation of the papers and that he just listened, as "They seemed to be friendly people." Plaintiff made out two checks, one for $2,300 covering the balance of $2,500 for the purchase price of the business, and one for $343.22 covering the inventory. He said that while he was handing defendants these checks in the bank Mr. Baker told him again that the lease was "supposed to go on from year to year the same as what he said over the telephone." When the checks were delivered to Mr. Baker, plaintiff received an assignment of the Graham lease to Mr. Baker, dated June 23, 1947, hereinbefore referred to. He also received a bill of sale for personal property, consisting of a gas stove, griddle, Coolerator, electric ice-cream cabinet, coffee maker, electric fan, beer cooler, steam table, electric toaster, pressure cooker, French fryer, potato cuber, clock, malted milk machine, two awnings, two fluorescent lights, two paper dispensers, two toilet paper dispensers, stool, two mirrors, miscellaneous dishes, glassware, silverware, and a furnace coil. These items were apparently figured in at $1,600 in the total $2,500 purchase price for the business. The execution date of the assignment of the lease and of the bill of sale was August 26, 1947.

Plaintiff testified that he was not represented by an attorney and that the first time he saw the lease in question was when he went to the bank with defendants to close the deal. He said that it never occurred to him during the interval between the time he came to St. Cloud and the date the deal was closed to look at the lease. He said that he did not look over the papers particularly. "I did not go into anything, I just took his word for whatever was going on there." He testified that he had never been in business before, as he had been an engineer and tool designer for 20 years.

On or about August 26, 1947, after the deal was closed at the bank, plaintiff moved into the restaurant and started operating it. He testified that about four days later Martha Graham, one of the lessors, came into the restaurant and told plaintiff that she was the owner of the building. She requested him to take her over to see defendants, which he did. Plaintiff testified that she upbraided defendants and said that the price they had charged plaintiff for the place was ridiculous, because they (defendants) knew that the owners were coming back the following February and would take over the place again the following June. Apparently some further argument ensued between defendants and Mrs. Graham, but, in any event, plaintiff said that he asked Mr. Baker if he would give him back his money and that Mrs. Baker answered him that "if I wasn't satisfied she would be glad to give me my money back." Plaintiff testified that within a short time after this visit to the Baker home Mr. and Mrs. Baker came into the restaurant and that he again told them that if they would give him back $2,500 they could have the inventory, as he was willing to take a loss and get out from under. However, defendants declined to do so. A short time later this action was commenced to recover damages resulting from the alleged fraud of misrepresentation on the part of defendants.

Plaintiff testified that he had sustained a loss of $2,000 in the transaction, and based this loss upon the statement "that I have no business now, and if I work at it hard enough I possibly could get the difference between the two thousand dollars and the twenty-eight hundred I put in, if it goes on, if the lease is terminated by the first of July, I may get that money back." He said that defendants had told him that they had made a good living in the business. He also said that the first month he operated the business he made $113 and that out of this the license cost $100; that the following month he made $62; and that at the time of the trial he had $100 expense coming up for liability insurance. M. J. Honer, a real estate man in St. Cloud, placed the value of the business at nothing at the time of trial, the latter part of November 1947, taking into consideration the fact that the lease had only about seven months to go.

Although defendants appear content to have this case tested on the sole testimony of plaintiff and his witnesses, the record shows that Mr. Baker denied the statements claimed to have been made by him in the Chicago telephone conversation with plaintiff as to the renewability of the lease.

We believe that these are the issues for consideration:

(1) Does the parol evidence rule bar admission of evidence to show fraud in the procurement of the contract?

(2) Assuming that fraud was proved, was plaintiff's sole remedy to rescind the contract and recover damages suffered up to the time of rescission, or could plaintiff elect to stand on the contract and sue for damages for deceit?

(3) Were damages sufficiently proved?

█ It is well settled that the parol evidence rule is not applicable to exclude evidence of fraudulent oral representations by which one party induces another to enter a written contract, provided the representations were such that the other party might reasonably rely upon them. McElrath v. Electric Inv. Co. 114 Minn. 358, 131 N. W. 380; Nelson v. Berkner, 139 Minn. 301, 166 N. W. 347.

We believe that under the facts and circumstances of this case the testimony as to the telephone conversation between plaintiff and Mr. Baker was admissible and that it was a matter for the jury to determine which witness they were willing to believe.

█ Here we have a situation where plaintiff contends that he was fraudulently induced to enter into a contract upon the representation that the lease involved ran either from year to year or was renewable. At the time of the discovery of the alleged fraud or misrepresentation, there was a substantial part performance of the contract by plaintiff, inasmuch as he had paid the purchase price of $2,500 for the business and fixtures and $343.22 for the inventory. All that remained for him to do under the assignment of the lease was to pay the balance of the rent to defendants at the rate of $50 per month for about ten months.

In Schmitt v. Ornes Esswein & Co. 149 Minn. 370, 373, 183 N. W. 840, 842, we said:

"* * * The rule is that, where a party to a contract has partially performed it before discovering the falsity of the representation which induced him to enter into it, he is not obliged to retrace his steps, but may complete performance without waiving the fraud and then bring an action for damages for deceit. Humphrey v. Sievers, 137 Minn. 373, 163 N. W. 737; Townsend v. Jahr, 147 Minn. 30, 179 N. W. 486; Dawson v. Thuet Bros. 147 Minn. 429, 180 N. W. 534."

In the instant case, it appears that plaintiff at least made an offer to rescind the contract, which was declined by defendants. He was within his rights to then complete the performance without waiving the alleged fraud and bring this action for damages for the deceit.

Defendants appear to rely on the rule of Defiel v. Rosenberg, 144 Minn. 166, 174 N. W. 838. The facts in that case are clearly distinguishable from those in the instant case. That case involved a long-term lease covering a period of 99 years. The alleged fraud was discovered after the lease had been in effect approximately a year and a half. In referring to the Defiel case in Osborn v. Will, 183 Minn. 205, 212, 236 N. W. 197, 201, this court said:

"In Defiel v. Rosenberg, 144 Minn. 166, 174 N. W. 838, the rule was extended so as to hold that, where the part performance was but a mere trifle of the whole at the time the fraud was discovered, the rule should be the same as if there had been no part performance, and that the part performance there could be treated as severable from the remainder of the term—that being a long term lease."

Again, in Burke v. Johnson, 221 Minn. 274, 277, 21 N. W. (2d) 805, 806, this court said:

"In the Kohanik case [Kohanik v. Beckman, 212 Minn. 11, 2 N. W. (2d) 125] we limited the Defiel case to the facts therein involved and reaffirmed the rule stated in Humphrey v. Sievers, 137 Minn. 373, 163 N. W. 737, * * * and other cases, that, under an executory contract where substantial part performance has occurred before discovery of the fraud, the performance of the contract does not ratify the fraud by which it was obtained and does not preclude an action for damages."

■ Defendants raise the question whether plaintiff sufficiently proved damages. Plaintiff testified that his damages were $2,000, and he based his statement on the point that at the time of the trial in November 1947 he had no business and that from his experience all he could possibly hope to get out of the business between then and the first of the following July would be the difference between the $2,000 and what he paid for the business. His witness Honer said that the business was worth nothing at the time of trial. The jury returned a verdict of $1,750 for plaintiff.

Damages in an action for false representations and deceit are the natural and proximate loss sustained by the party because of reliance thereon. Reynolds v. Franklin, 44 Minn. 30, 46 N. W. 139, 20 A. S. R. 540; Townsend v. Jahr, 147 Minn. 30, 179 N. W. 486. In cases where the fraud induced a purchase, the measure of damages is the difference in value between what was given and what was received. Rockefeller v. Merritt (8 Cir.) 76 F. 909; Perkins v. Meyerton, 190 Minn. 542, 251 N. W. 559. The burden of proving his loss is on plaintiff, and the amount of damages is a question of fact for the jury to determine from a consideration of all the facts of the case. Vilett v. Moler, 82 Minn. 12, 84 N. W. 452.

It is quite apparent from the record that plaintiff was somewhat inexperienced, naive, and trusting in connection with a business transaction of the kind here involved. This situation is well exemplified by the following response plaintiff gave to an inquiry as to whether any questions he may have asked about the deal in the bank were answered: "Well, I am afraid I did not ask very many questions about that, I took their word for what they told me." On the other hand, it is apparent that defendants, and especially Mr. Baker, were people of more business experience than plaintiff in matters of this kind. The record shows that Mr. Baker had been engaged in the real estate business for about a year. It is also evident from the record that defendants well knew before they closed the deal with plaintiff on August 26, 1947, that they could not get a lease from Graham for longer than to July 1, 1948, and that they also knew that Graham was not engaged in civil service work that re-

quired four more years' employment before he retired. It also appears from the testimony of Graham's daughter that as early as August 7, 1947, defendants knew that Graham intended to return to the premises himself after July 1, 1948. Yet, in the face of all this information, plaintiff claims that Mr. Baker told him over the telephone in his Chicago call either that the lease was for one year only but that it ran from year to year, or that he would have no trouble getting it renewed from year to year. Plaintiff claims that he relied on this representation and was damaged. The trial court and jury heard this testimony. The jury had the opportunity of observing the witnesses, and it returned a verdict for damages for plaintiff. The trial court refused to set it aside or to grant a new trial. We are required to take the view of the evidence most favorable to plaintiff. In doing so, we believe that there was evidence sufficient to sustain the ruling of the trial court.

Affirmed.

